# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

ALBERTSON'S LLC, NEW ALBERTSONS L.P., SAFEWAY INC., and UNITED SUPERMARKETS, LLC,

        Plaintiffs,

        v.

EXPRESS SCRIPTS, INC.,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. N25C-12-001 KMM CCLD

Date Submitted: May 12, 2026
Date Decided: August 5, 2026

*Defendant's Motion to Dismiss –* **GRANTED**, in part, **DENIED**, in part

## <u>MEMORANDUM OPINION AND ORDER</u>

Brian M. Rostocki, Nicholas R. Rodriguez, Evan D. Sweeney, REED SMITH LLP, Wilmington, Delaware; Selina P. Coleman (argued), Alexandra R. Klimkiewicz, REED SMITH LLP, *Attorneys for Plaintiffs*.

Marisa R. De Feo, HUSCH BLACKWELL LLP, Wilmington, Delaware; Sarah C. Hellmann, Elizabeth A. Bozicevic (argued), HUSCH BLACKWELL LLP, St. Louis, Missouri, *Attorneys for Defendant*.

**Miller, J.**

## I. INTRODUCTION

The facts here are straightforward. Plaintiffs Albertson's LLC, New Albertsons L.P., Safeway Inc., and United Supermarkets, LLC (together, "Albertsons") and Express Scripts, Inc. ("Express Scripts") are parties to contracts, pursuant to which Express Scripts reimburses Albertsons for prescription drugs it fills for certain of its customers. The parties agreed that the reimbursement for brand drugs is paid at a higher price than a generic drug. Express Scripts makes a payment to Albertsons when a prescription is filled. The parties also agreed to an annual reconciliation which determines the amount, if any, owed to Albertsons on an annual basis.

The reconciliation is calculated based on the classification of the drugs at the time of reconciliation—generic or brand. Albertsons asserts that Express Scripts breached the contracts because it classified certain drugs at the point-of-sale as "brand," but then reclassified some of these drugs as "generic" for purposes of the annual reconciliation. By doing so, Albertsons claims Express Scripts failed to pay Albertsons millions of dollars.

Alternatively, Albertsons asserts that Express Scripts breached the implied covenant of good faith and fair dealing because it exercised its contractual discretion in a manner that deprived Albertsons the benefit of its bargain. Finally, Albertsons

1

asserts a claim for unjust enrichment in the alternative, claiming that Express Scripts improperly withheld millions of dollars based on the reclassification of drugs.

Express Scripts moves to dismiss under Superior Court Rule 12(b)(6) (the "Motion"),[1] arguing that Albertsons failed to plead cognizable unjust enrichment and implied covenant claims because valid contracts control the parties' relationship and the reconciliation process is governed by the contract, which cannot be rewritten to grant Albertsons additional rights. Express Scripts argues that the breach of contract claim is barred by the contractual dispute procedure because Albertsons failed to initiate this action within the time period provided in the agreement.

Express Scripts finds success on the non-contract claims. The contract includes a process by which Express Scripts is to calculate the annual reconciliation, expressly stating the mechanism by which a drug's classification is to be determined. The contract does not require that the classification at the point-of-sale control the classification for the reconciliation payment. Because Express Scripts' method of reconciliation is authorized by the agreement, the implied covenant claim must be dismissed. The Motion is **GRANTED** on Count II.

Similarly, Albertsons cannot rely on an unjust enrichment claim for recovery because a valid and enforceable contract governs the parties' relationship. Therefore, the Motion is **GRANTED** on Count III.

---

[1] D.I. 15.

2

Express Scripts' forfeiture argument, however, fails. Resolution of this argument requires fact-finding, which defeats the Motion. Therefore, the Motion is **DENIED** on Count I.

## II. FACTUAL BACKGROUND[2]

### A. *The Express Scripts and Albertsons relationship*

As a Pharmacy Benefit Manager ("PBM"),[3] Express Scripts manages prescription drug benefits for health insurance plans, employers, government programs, and other entities principally responsible for paying for prescription drugs ("Sponsors"). Express Scripts is an intermediary between insurance companies, pharmacies, and drug manufacturers.[4] Among other things, Express Scripts contracts with a network of pharmacies and establishes payment levels for them.[5]

Albertsons is a food retailer that operates over 1,700 pharmacies across 35 states and the District of Columbia.[6] Express Scripts and Albertsons have a long-standing contractual relationship through which Albertsons' pharmacies are "in-network" pharmacies for members of health plans, for which Express Scripts administers the prescription-drug benefits ("Plan Members").[7] The Express Scripts-

---

[2] The facts are derived from the Consolidated Complaint, D.I. 6. ("Compl."), and the documents it incorporates by reference.
[3] Compl. ¶ 2.
[4] *Id.* ¶ 3.
[5] *Id.* ¶ 17.
[6] *Id.* ¶ 4.
[7] *Id.* ¶ 44.

Albertsons relationship is memorialized in numerous Pharmacy Provider Agreements (together, the "Provider Agreement").[8]

## B. *The classification of drugs and structure of payments*

Under the Provider Agreement, Express Scripts agreed to reimburse Albertsons for covered medications dispensed to Plan Members.[9] The amount Express Scripts pays depends, in large part, on whether the drug is classified as generic or brand. The Provider Agreement defines "Generic Drug" as:

> [A] prescription drug – whether identified by its chemical, proprietary, or non-proprietary name – which is pharmaceutically equivalent and interchangeable with a drug containing an identical amount of the same active ingredient(s) and approved by the FDA.[10]

To determine whether a drug is a Generic Drug, the Provider Agreement states:

> [T]he designation of a product as 'generic' … is determined by [Express Scripts], using [Express Scripts'] brand/generic algorithm and/or using data elements provided by First DataBank, Medi-Span, or other sources nationally recognized in the retail prescription drug industry.[11]

---

[8] *Id.* ¶ 45.
[9] *Id.* ¶ 49.
[10] Provider Agreement § 1.8.
[11] *Id.*

4

A "brand" drug is "any prescription drug that is not a Generic Drug."[12] Generic and brand drugs are reimbursed at different rates, with brand drugs being reimbursed at higher rates than Generic Drugs.[13]

When a Plan Member fills a drug prescription at Albertsons, it enters the Plan Member's information into an electronic system. This information is transmitted to Express Scripts' third-party processor to determine whether the drug is a covered medication under the Plan Member's plan and the amount of any Copayment due at the point-of-sale transaction, which Albertsons is required to collect.[14] Whether the drug is generic or brand impacts the point-of-sale price and possibly, the Plan Member's Copayment, which is determined by the Sponsor. Albertsons is informed of the amount Express Scripts is expected to reimburse Albertsons for dispensing the drug.[15] This is referred to as the claim adjudication process. Express Scripts makes an initial payment to Albertsons based on the point-of-sale transaction.[16]

The Provider Agreement requires Express Scripts to pay Albertsons for covered drugs at "the rates set forth in the applicable rate sheet(s) … less the applicable Copayment."[17] The terms for reimbursement are set forth in Exhibit A –

---

[12] Compl. ¶ 48. The Provider Agreement does not specifically define "brand drug." This definition originates from the 2023 Provider Manual, which is incorporated by reference into the Provider Agreement. *Id.*; Compl., Ex. C § 11.

[13] Compl. ¶ 62.

[14] *Id.* ¶¶ 29-30; Provider Agreement § 2.4.a.

[15] Compl. ¶ 31.

[16] *Id.*

[17] Provider Agreement § 3.1.a.

ES1000, attached to the Provider Agreement (the "Rate Schedule").[18]  Express Scripts performs an annual end-of-year reconciliation using the Rate Schedule to evaluate whether any further payment is due to Albertsons.[19]  Express Scripts calculates the annual pricing guarantees based on the formula for brand and Generic Drugs in the Rate Schedule and applies them to Albertsons' sales during the year.[20]  If the initial payments are less than this calculated amount, Express Scripts owes Albertsons the difference.  If the initial payments are equal to or more than the calculated amount, Express Scripts owes nothing further.

The Rate Schedule includes a procedure for Albertsons to dispute the reconciliation and final reimbursement.  Under Section 2.2.b, Albertsons must: (1) notify Express Scripts in writing within 45 days after receipt of the reconciliation report with "claim level detail necessary to support the Dispute[;]" (2) engage in "good faith negotiations" for a period of 60 days; and if no resolution has been reached, invoke the Dispute Resolution Process set forth in the Provider Agreement

---

[18] The reimbursement amount is derived from the applicable "Average Wholesale Price" or "AWP" for a medication as determined "by Med-Span or other comparably reliable source as determined and selected by [Express Scripts] in its sole and absolute discretion with advance written notice" to Albertsons. *Id.* § 1.2.  The annual reconciliation amount is determined by a discount off the AWP.  Discounts on brand drugs is lower than the discount on generic drugs. *Id.*, Rate Schedule § 2.4.a; Compl. ¶¶ 50-53.
[19] Provider Agreement, Rate Schedule § 2.
[20] Compl. ¶¶ 33-34; Provider Agreement, Rate Schedule §§ 2.2, 2.4.

within 30 days.[21]  If Albertsons fails to timely invoke the Dispute Resolution Process, it is deemed to have accepted Express Scripts' calculations.[22]

## C.    *The dispute*

In February 2024, Express Scripts provided Albertsons with year-end reports for calendar year 2023, which calculated the guaranteed amounts due based on Albertsons' 2023 sales (the "Year End Reports").[23]  The Year End Reports reflected that Express Scripts owed Albertsons an additional $3,655,627.  This amount has not been paid.

Further review, however, revealed that some drugs, which were classified as "brand" at point-of-sale, were reflected in the Year End Reports as Generic Drugs, resulting in a lower reimbursement calculation.[24]  Albertsons believes that Express Scripts "appear[s] to [have] flip[ped] many drugs previously classified as brand to

---

[21] The Dispute Resolution Process in the Provider Agreement states that

> [t]he aggrieved party shall notify the other party of its Claim including sufficient detail to permit the other party to respond.  The parties agree to meet and confer in good faith to resolve any Claims that may arise under this Agreement for a period of not less than thirty (30) days.  In the event the parties cannot resolve any Claims pursuant to Good Faith Discussions and the minimum thirty (30) day period has been met, then the aggrieved party may end discussions with the other party by providing written notice to the other party of its intent to cease discussions. Thereafter, the parties may proceed to litigation.

Provider Agreement § 7.12.
[22] *Id.*, Rate Schedule § 2.2.b.
[23] Compl. ¶ 58.
[24] *Id.* ¶ 60.

generic drugs."[25]  Accordingly, on March 28, 2024, Albertsons sent Express Scripts the required notice of dispute of the 2023 reports, with claim level details.[26] Albertsons claims that Express Scripts reclassifying drugs from brand to generic resulted in an underpayment of at least $7.3 million.[27]

Express Scripts requested, and Albertsons provided, more information on March 28 and April 10.[28]  Albertsons sent additional information requested by Express Scripts, which it confirmed receiving on April 12, 2024.[29]  On May 24, 2024, Express Scripts emailed Albertsons with more questions and offered to discuss the dispute the following week.[30]

On July 17, 2024, Albertsons sent Express Scripts an email seeking to resolve the dispute.[31]  Express Scripts failed to respond until August 6, 2024, despite numerous follow up emails from Albertsons, when Express Scripts indicated that it would respond by the end of the week.[32]  Express Scripts substantively responded on August 12, 2024.  On August 15, Albertsons responded to Express Scripts and

---

[25] *Id.*
[26] *Id.* ¶ 68.
[27] *Id.* ¶ 67.
[28] *Id.* ¶¶ 68-70.
[29] *Id.* ¶¶ 72-73.
[30] *Id.* ¶ 74.
[31] *Id.* ¶ 75.
[32] *Id.* ¶¶ 75-78.  Follow up emails were sent on July 29, 2024, and August 1, 2024.

stated that it would be requesting a legal-to-legal call.[33]  After a few more follow-ups, the legal-to-legal call occurred on October 1.[34]

Two days later, Express Scripts for the first time took the position that Albertsons forfeited its right to dispute the Year End Reports because it failed to invoke the Dispute Resolution Process by June 26, 2024.[35]  On October 23, 2024, Albertsons countered that Express Scripts waived its right to enforce the contractual timeline because it continued negotiations with Albertsons beyond the deadline and unreasonably delayed the negotiation period.[36]

The parties continued communications until November 25, 2025, when Albertsons filed this action.[37]

### III.    PARTIES' CONTENTIONS

Express Scripts argues that the implied covenant of good faith and fair dealing has no application here because there is no "gap" in the Provider Agreement to be filled, and Express Scripts used its contractual discretion in a manner explicitly authorized by the Provider Agreement.[38]  Albertsons counters that it does not rely on a gap in the Provider Agreement to invoke the covenant, but rather, asserts that Express Scripts "exploited its discretion to deprive Albertsons of the benefit of the

---

[33] *Id.* ¶¶ 80-81.
[34] *Id.* ¶¶ 82-84.
[35] *Id.* ¶ 84.
[36] *Id.* ¶ 85.
[37] *Id.* ¶¶ 86-99.
[38] D.I. 15 ("OB") at 6-7; D.I. 32 ("RB") at 7-11.

parties' bargain."[39] Further, Albertsons argues that even if the Court disagrees with its contractual interpretation, the Motion must be denied because Albertsons is permitted to plead its implied covenant claim in the alternative at this stage.[40]

With a valid and enforceable contract, Express Scripts argues the unjust enrichment claim must also be dismissed.[41] Albertsons contends that the enforceability of the Provider Agreement is called into question because Express Scripts denies Albertsons' right to recover under its interpretation of the contract and therefore, unjust enrichment is properly pled in the alternative.[42]

Finally, Express Scripts contends that Albertsons is barred from bringing this action because it failed to timely invoke Section 7.12's Dispute Resolution Process.[43] Albertsons makes three arguments in response. First, the Rate Schedule Section 2.2.b dispute procedure applies to a dispute over the reconciliation calculations. Here, however, the dispute goes to a fundamental issue of Express Scripts reclassifying drugs. Therefore, the Section 7.12 Dispute Resolution Process (rather than Section 2.2.b) applies. Second, Express Scripts waived any defense based on Section 2.2.b by continuing to engage in negotiations after the applicable

---

[39] D.I. 30 ("AB") at 5-9.
[40] *Id.* at 8-9.
[41] OB at 8-9; RB at 11-13.
[42] AB at 9-10.
[43] OB at 9-10.

deadline and its delayed responses.[44] Third, it substantially complied with the dispute procedure and therefore, should not be forced to forfeit its claims.[45]

## IV. STANDARD OF REVIEW

On a motion to dismiss pursuant to Superior Court Civil Rule 12(b)(6), "the governing pleading standard is…reasonable conceivability."[46] Accordingly, the court must "deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[47] When considering a motion under Rule 12(b)(6), the court "must accept all well-pleaded factual allegations in the [c]omplaint as true, accept even vague allegations…as 'well-pleaded' if they provide defendant notice of the claims, [and] draw all reasonable inferences in favor of the plaintiff[.]"[48] "[U]nder Delaware's judicial system of notice pleading, a plaintiff need not plead evidence. Rather, the plaintiff need only allege facts that, if true, state a claim upon which relief can be granted."[49] The court, however, does not accept "conclusory allegations unsupported by specific facts," or "draw unreasonable inferences in the plaintiff's favor."[50]

---

[44] AB at 10-16.
[45] *Id.* at 13-14.
[46] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 537 (Del. 2011).
[47] *Id.* at 536.
[48] *Id.* at 537.
[49] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 611 (Del. 2003).
[50] *Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 238 A.3d 863, 871 (Del. 2020) (citation omitted).

11

## V.   DISCUSSION

### A.   *The implied covenant of good faith and fair dealing*

Express Scripts argues that Albertsons' implied covenant of good faith and fair dealing claim cannot stand because the Provider Agreement permits the process about which Albertsons complains.[51]   In Express Scripts' view, Albertsons is attempting to rewrite the contract to compel Express Scripts to use the same drug classification at point-of-sale and annual reconciliation.[52]

Albertsons responds Express Scripts cannot exercise its discretion at point-of-sale to classify a drug for purposes of the Plan Member's Copay and an initial payment to Albertsons, and then "cherry-pick" another source to pay Albertsons a lower rate to advantage itself while disadvantaging Albertsons at reconciliation.[53] Even if the reconciliation is governed by the contract, Albertsons asserts that it is permitted to plead the implied claim in the alternative because the Court may not agree with Albertsons' contract interpretation.[54]

The implied covenant of good faith and fair dealing "'attaches to every contract.'"[55] Viewed from the time of contracting, the covenant "ensures that neither

---

[51] OB at 6.
[52] *Id.* at 6-7; RB at 7-11.
[53] AB at 6-7.
[54] *Id.* at 7-8.
[55] *Johnson & Johnson v. Fortis Advisors LLC*, 352 A.3d 229, 253 (Del. 2026) (the court may only imply terms "'where obligations can be understood from the text of a written agreement but have nevertheless been omitted in the literal sense,' and only to protect the 'reasonable expectations' that the parties shared at signing.").

12

party acts arbitrarily or unreasonably to frustrate the fruits of their bargain."[56]  As used in the implied covenant, "good faith" does not mean "loyalty to the contractual counterparty, but rather faithfulness to the scope, purpose, and terms of the parties' contract."[57]  "Fair dealing" does not mean "fair process" akin to an entire fairness analysis, but rather, that the party acted "consistently with the terms of the parties' agreement and its purpose."[58]  The implied covenant is to be "surgically" applied and cannot be used to "rewrite the contract to appease a party who later wishes to rewrite a contract [it] now believes to have been a bad deal."[59]  "The policy underpinning the implied duty of good faith and fair dealing does not extend to post contractual rebalancing of the economic benefits flowing to the contracting parties."[60]  "[H]indsight cannot correct oversight."[61]

The implied covenant of good faith and fair dealing applies in two primary circumstances.  The first is when "unforeseen developments—contingencies neither anticipated nor resolved by the contract—that threaten the parties' bargained-for

---

[56] *Id.* (citing *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005)); *Miller v. HCP & Co.*, 2018 WL 656378, at *9 (Del. Ch. Feb 1, 2018), *aff'd sub nom. Miller v. HCP Trumpet Investments, LLC*, 194 A.3d 908 (Del. 2018); *Jiggy Puzzles, LLC v. Steelhead Acquisition EE, Inc.*, 2026 WL 465112, at *6 (Del. Super. Feb. 18, 2026).

[57] *Gerber v. Enter. Prods. Holdings, LLC*, 67 A.3d 400, 419 (Del. 2013).

[58] *Id.* at 418-19.

[59] *Johnson & Johnson*, 352 A.3d at 253 (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) ("Parties have a right to enter into good and bad contracts, the law enforces both.")).

[60] *Nemec*, 991 A.2d at 1128.

[61] *Johnson & Johnson*, 352 A.3d at 254; *Jiggy Puzzles, LLC*, 2026 WL 465112, at *7 (quoting *Nemec*, 991 A.2d at 1127-28) (the covenant does not allow "post contractual rebalancing of the economic benefits flowing to the contracting parties.").

economic expectations" arise.[62] Albertsons expressly disavows reliance on this ground.

The second is "when a contract allocates discretionary authority to one party over a central aspect of the contract."[63] The implied covenant requires that such discretionary authority be exercised reasonably and in good faith.[64] When the party with discretion exploits it "in a manner that defeats the 'overarching purpose' of the bargain, courts may imply a requirement that such discretion be exercised reasonably and in good faith to ensure that the discretionary power is applied consistently with what reasonable parties would have agreed to at signing."[65]

The Provider Agreement expressly permits Express Scripts to use one of the four stated sources to classify a drug as a Generic Drug.[66] There is no claim that Express Scripts failed to use one of these sources. Rather, Albertsons' theory is that if Express Scripts exercises its discretion to select a data source at the point-of-sale to classify a drug, it cannot later exercise its discretion to use another data source to

---

[62] *Johnson & Johnson*, 352 A.3d at 254.
[63] *Id.* at 253.
[64] *Id.* at 254 n.16 (collecting cases).
[65] *Id.* at 253.
[66] (1) Express Scripts' brand/generic algorithm, (2) data elements provided by First DataBank, (3) Medi-Span, or (4) other sources nationally recognized in the retail prescription drug industry. Provider Agreement § 1.8.

14

reclassify the drug at the time of reconciliation.[67]  By doing so, Albertsons argues that Express Scripts deprived Albertsons of the benefit of its bargain.

The starting point is the Provider Agreement.  At the point-of-sale, Albertsons inputs the prescription drug information into a database and determines the Plan Member's resulting Copay, if any.  The database identifies the drug as generic or brand.  The Provider Agreement requires Express Scripts to make a payment on this adjudicated claim within 30 days, on average.[68]

The Rate Schedule provides that Albertsons "shall receive reimbursement" equal to, relevant here, "the applicable AWP discount plus applicable dispensing fee as set forth in Section 2.4"[69]  The Rate Schedule goes on to state:

> The annual effective Average Discount and Dispense Fee guarantees specified below in Section 2.4 are not Sponsor-specific claims adjudication rates…. The overall Average Discount and Dispense Fee for any given Year[70] shall ultimately be the AWP discount and dispense fee set forth in the Contract Rates table for the applicable Schedule as set forth below in Section 2.4.[71]

Section 2.4 contains the Contract Rate tables, identifying the applicable discount off the AWP for brands and Generics.

---

[67] Albertsons alleges that some of the drugs classified as Generic in the Year End Reports are classified as brand drugs in Medi-Span and First DataBank. Compl. ¶ 65.

[68] Provider Agreement § 3.1.a.

[69] *Id.*, Rate Schedule § 2.1.

[70] The Year is based on a calendar year. *Id.* § 1.7.

[71] *Id.* § 2.2.

Within 45 days of the end of an applicable Year, Express Scripts is required to send Albertsons a summary calculation report (the "Summary Report") and a Year End Report "of all [Albertsons] claims …. to allow [Albertsons] to determine [Express Scripts'] end of year performance on claims processed during the applicable year versus the aggregate annual Average Discount and Dispense Fee guarantees in this [Rate Schedule]."[72]

These provisions reflect the parties' agreement that Albertsons is to receive an annual guaranteed payment based on the Contract Rate tables. Express Scripts makes payments in the claims adjudication process. After the applicable calendar year, Express Scripts prepares the Year End Reports, the express purpose of which is to reconcile the amount Express Scripts paid during the year against the guaranteed payment set forth in the Rate Schedule. The Contract Rate tables reflect the discount off the AWP, which requires a drug to be classified. To make this classification, Express Scripts is permitted to exercise its discretion to select one of the four data sources. Express Scripts' selection of a data source that benefits itself is not an abuse of discretion. The contract does not require Express Scripts to select the data source most beneficial to Albertsons, nor does the covenant of good faith and fair dealing. Indeed, Express Scripts does not owe any loyalty to Albertsons.

---

[72] *Id.* § 2.2.a.

That Express Scripts may have used a different data source in the claim adjudication process, which classified certain drugs as brand, does not implicate the implied covenant. Express Scripts' exercise of discretion at the annual reconciliation is "faithful[] to the scope, purpose, and terms of the parties' contract."[73] If Albertsons wanted to require Express Scripts to use the same classification at point-of-sale and reconciliation, it could have negotiated for that at the bargaining table. The implied covenant cannot be used to rewrite the parties' contract because one party is unhappy with the results of the bargained for deal.[74]

Finally, Albertsons argues that even if the Court agrees with Express Scripts, Albertsons' implied covenant claim still survives the Motion because Delaware courts allow an implied covenant claim to be pled in the alternative to a breach of contract claim.[75]

Albertsons is correct that Delaware courts will allow an implied covenant claim to be pled in the alternative to a breach of contract, but only in limited circumstances, such as when the contract is ambiguous or a factual dispute exists over whether the contract governs the complained of conduct.[76] Here, the Provider

---

[73] *Gerber v. Enter. Prods. Holdings, LLC*, 67 A.3d 400, 418-19 (Del. 2013).
[74] *Johnson & Johnson*, 352 A.3d at 251 (the implied covenant "enforces the parties' reasonable expectations in circumstances that they could not foresee and did not address in their written agreement, but it may not be used to rewrite or contradict express terms.").
[75] AB at 8.
[76] *DuPont De Nemours, Inc. v. Hemlock Semiconductor Operations LLC*, 2024 WL 3161799, at *11-12, 12 n.149 (Del. Super. June 10, 2024) (factual questions regarding the scope and interplay, if any, of multiple contracts among the parties precluded dismissal of the implied covenant claim,

Agreement governs the challenged conduct and no party argues that the contract is ambiguous. As such, the implied covenant claim cannot be pled in the alternative and it must be dismissed.[77]

## B.    *Unjust enrichment*

Express Scripts argues that the unjust enrichment claim must be dismissed because the relationship is governed by a valid and enforceable contract.[78] Albertsons counters that because Express Scripts contends that Albertsons cannot recover under its breach of contract claim, the unjust enrichment claim is properly pled in the alternative.[79]

The claim of unjust enrichment was developed by courts "as a theory of recovery to remedy the absence of a formal contract[.]"[80] "Unjust enrichment is 'the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good

---

which was pled in the alternative); *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *7 (Del. Ch. Apr. 20, 2009) (implied covenant claim not dismissed because the contract was ambiguous).

[77] *3M Co. v. Neology, Inc.*, 2019 WL 2714832, at *11 (Del. Super. June 28, 2019) (where the agreements "squarely address" the challenged conduct, the implied covenant claim must be dismissed as duplicative of the breach of contract claim).

[78] OB 8-9.

[79] AB at 9-10. Albertsons contends that Express Scripts was unjustly enriched by retaining more money than it was entitled had it complied with the Provider Agreement. Compl. ¶ 122.

[80] *James v. United Med. LLC*, 2017 WL 1224513, at *7 (Del. Super. Mar. 31, 2017) (quoting *Alltrista Plastics, LLC v. Rockline Indus., Inc.*, 2013 WL 5210255, at *11 (Del. Super. Sept. 4, 2013)).

conscience.'"[81]   To adequately plead an unjust enrichment claim a plaintiff must plead that there was "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and the impoverishment, and (4) the absence of justification."[82]

Superior Court Civil Rule 8 allows a party to plead claims in the alternative, even if those claims are inconsistent.[83]   "Alternative theories of recovery are permissible where the existence of the contract is in dispute."[84]   An unjust enrichment claim is not available where a contract "governs the relationship between parties that gives rise to the unjust enrichment claim."[85]   Where neither party

---

[81] *Hopewell Logistics, Inc. v. Boomi, L.P.*, 2026 WL 2111406, at *8 (Del. Super. June 30, 2026) (quoting *Fleer Corp. v. Topps Chewing Gum, Inc.*, 539 A.2d 1060, 1062 (Del. 1988)).
[82] *Id.* (citing *State ex rel. Jennings v. Monsanto Co.*, 299 A.3d 372, 390 (Del. 2023)).
[83] Super. Ct. Civ. R. 8(e)(1).
[84] *Biomedical Statistical Consulting LLC v. Cordio Med. Ltd.*, 2026 WL 1166220, at *4 (Del. Super. Apr. 29, 2026) (citing *Dillon Gage Incorporated of Dallas v. Umicore Precious Metals USA Inc.*, 2025 WL 3779149, at *3 (Del. Super. Dec. 30, 2025)).
[85] *James*, 2017 WL 1224513, at *7 (quoting *Alltrista Plastics, LLC*, 2013 WL 5210255, at *11).

challenges the enforceability or validity of the express contract, the unjust enrichment claim will be dismissed.[86]

The Provider Agreement governs the parties' dispute here. Simply because Express Scripts denies that Albertsons is entitled to recover under its contract theory does not call into question the enforceability of the contract.

Albertsons' reliance on *V-ME Media, Inc. v. Faith7, Inc.* and *Southeastern Chester Cnty. Refuse Auth. v. BFI Waste Servs. of Penn., LLC* is misplaced. In each of these cases, the enforceability of the contract was at issue.[87] Here, there is no

---

[86] *Alltrista Plastics, LLC*, 2013 WL 5210255, at *11; *James*, 2017 WL 1224513, at *7; *Envolve Pharmacy Sols., Inc. v. Rite Aid Hdqtrs. Corp.*, 2021 WL 140919, at *9 (Del. Super. Jan. 15, 2021) (pleading unjust enrichment is only permissible "when there is doubt surrounding the enforceability or existence of the contract.").

[87] *V-ME Media, Inc. v. Faith7, Inc.* 2024 WL 4524844, at *6 (Del. Super. Oct. 18, 2024), *as corrected* (Nov. 26, 2024) (adopting a wait-and-see approach and deferring ruling on the unjust enrichment claim at the motion to dismiss stage because certain pleaded defenses might impact the enforceability of the contract); *Se. Chester Cnty. Refuse Auth. v. BFI Waste Servs. of Penn., LLC*, 2015 WL 3528260, at *4-5 (Del. Super. June 1, 2015) (declining to dismiss the unjust enrichment claim because the validity of the assignment of the contract was at issue, calling into question the enforceability of the contract).

challenge to the enforceability of the Provider Agreement. Accordingly, the unjust enrichment claim must be dismissed.

## C.   *Is the breach of contract claim barred?*

Express Scripts argues that Albertsons is barred from bringing this action because it did not timely invoke the Provider Agreement's Dispute Resolution Process.[88]

Albertsons responds that the Rate Schedule dispute procedure (Section 2.2.b) does not apply because its claims are broader than an objection to the reconciliation calculations. Albertsons contends that the Provider Agreement's Dispute Resolution Process (Section 7.12) applies, and it complied with that section.[89] Alternatively, Albertsons argues that even if Section 2.2.b applies, its claims are not barred because: (1) the parties' course of performance modified the dispute resolution procedure; (2) it substantially complied with the procedure; (3) Express Scripts' delay in participating in negotiations effectively prevented Albertsons from complying with the dispute resolution procedure; and (4) due to this delay Express Scripts is estopped from invoking the timing provision.[90]

---

[88] OB at 9-10.
[89] AB at 11.
[90] *Id.* at 11-12.

21

## 1. Does Section 2.2.b apply to this dispute?

Albertsons argues that Section 2.2.b does not apply because its claims center on Express Scripts' classification of drugs as Generic Drugs, the definition of which is in the Provider Agreement (not the Rate Schedule).[91] Express Scripts responds that Section 2.2.b applies because Albertsons is challenging the reconciliation reimbursement mechanism, which is found in the Rate Schedule.[92]

Section 2.2.b states that Albertsons "shall be deemed to have approved and accepted [Express Scripts'] performance set forth in the Summary Report unless [Albertsons] notified [Express Scripts] in writing within forty-five (45) days after [Albertsons'] receipt of the Summary Report."[93] Albertsons is challenging the "2023 reconciliation files."[94] By its plain terms, Section 2.2.b applies to the disputed claims.

## 2. Has the contract been modified through course of performance?

Albertsons argues that the parties' course of performance modified the contractual deadline, as evidenced by Express Scripts' continued communications and negotiations after the June 2024 deadline.[95] Relying on *Motors Liquidation Co.,*

---

[91] *Id.* at 11. Albertsons argue that Section 2.2.b does not apply to the $3.6 million Express Scripts undisputedly owes Albertsons. Express Scripts does not argue otherwise. *See* D.I. 34 ("Tr.") at 64-65 ("because . . . the 3.6 is in th[e] Summary Report, the Plaintiff is deemed to have accepted that").

[92] RB at 14.

[93] Provider Agreement, Rate Schedule § 2.2.b.

[94] Compl. ¶ 68.

[95] AB at 12-13.

*Dip Lenders Trust v. Allianz Ins. Co.*, Express Scripts responds that because the agreement is unambiguous, course of performance is irrelevant.[96]

*Motors Liquidation* does not stand for the proposition that course of conduct is not relevant to waiver or modification of the contract. That court ruled just the opposite—terms of a written agreement may be modified by the parties' conduct. Thus, course of conduct is relevant.[97] Albertsons raises factual disputes regarding contract modification that cannot be resolved on a motion to dismiss.[98]

### 3. *Did Albertsons substantially comply with the dispute procedure?*

Albertsons argues that it substantially complied with the requirements of Section 2.2.b by (1) providing notice of the dispute and all claim level details within 45 days of receiving the Summary Report; (2) engaging in good faith negotiations; and (3) ultimately notifying Express Scripts of its intent to proceed to litigation after negotiations and settlement attempts failed.[99] Express Scripts contends that Albertsons' substantial compliance argument fails because it did not invoke the Dispute Resolution Process until 21 days after the deadline.[100]

---

[96] RB at 15 n.35 (citing *Motors Liquidation Co., Dip Lenders Tr. v. Allianz Ins. Co.*, 2013 WL 7095859, at *5 (Del. Super. Dec. 31, 2013), *aff'd sub nom. Motors Liquidation Co. DIP Lenders Tr. v. Allstate Ins. Co.*, 191 A.3d 1109 (Del. 2018)).

[97] *Motors Liquidation Co.*, 2013 WL 7095859, at *5 (citing *Pepsi–Cola Bottling Co. of Asbury Park v. Pepsico, Inc.*, 297 A.2d 28, 33 (Del.1972) ("any … provision of a written agreement may be waived or modified")).

[98] *See* Compl. ¶¶ 68-99.

[99] AB at 13-14.

[100] RB at 15 n.36.

"The requirement of substantial compliance is an attempt to avoid 'harsh results … where the purpose of the[ notice] requirement[] has been met.'"[101] Substantial performance means "'despite deviations from contract requirements,'" the notice "'provide[d] the important and essential benefits of the contract.'"[102] The determination of whether "the requirements of the substantial compliance doctrine [has been satisfied] is one of fact."[103]

Albertsons alleges that it fulfilled the requirements of Sections 2.2.b and 7.12, except for the explicit invocation of Section 7.12 within 30 days.[104] Albertsons raised questions of fact which cannot be resolved at this stage.[105]

### 4. *Does the prevention doctrine bar Express Scripts' enforcement of the Dispute Resolution Procedure?*

Albertsons argues that Express Scripts' delay in responding to Albertsons' settlement proposal made it impossible to meet the deadline to invoke the Dispute

---

[101] *Gildor v. Optical Sols., Inc.*, 2006 WL 4782348, at *7 (Del. Ch. June 5, 2006) (quoting *Colson v. Bureau of Labor and Indus.,* 831 P.2d 706, 709 (Or. Ct. App. 1992)); *Kelly v. Blum*, 2010 WL 629850, at *8 n.52 (Del. Ch. Feb. 24, 2010).

[102] *Gildor*, 2006 WL 4782348, at *7 (quoting 17A AM. JUR. 2D Contracts § 619 (2005)); *Kelly*, 2010 WL 629850, at *8 n.52.

[103] *Travelers Life & Annuity Co. v. Desiderio*, 2007 WL 2019795, at *2 n.5 (Del. Ch. July 3, 2007) (citing *The Prudential Ins. Co. of Am. v. Kamrath,* 475 F.3d 920, 925 (8th Cir.2007)).

[104] AB at 13-14.

[105] *Travelers Life & Annuity Co.*, 2007 WL 2019795, at *2 n.5.

Resolution Process.[106]  Having failed to respond, Express Scripts waived any argument that the prevention doctrine cannot be invoked here.[107]

The prevention doctrine provides that "'where a party's breach by nonperformance contributes materially to the non-occurrence of a condition of one of his duties, the non-occurrence is excused.'"[108]  Stated differently, "'a party may not escape contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent.'"[109]

Albertsons has raised factual disputes over the enforceability of the dispute procedure deadline.

### 5.   *Is Express Scripts estopped from enforcing the deadline?*

Albertsons argues that it detrimentally relied on Express Scripts' continued engagement in communications and negotiations well after the deadline had passed, and therefore, Express Scripts should be estopped from enforcing the claim

---

[106] AB at 15.

[107] *See* RB at 13-15; *see Emerald Partners v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999) ("Issues not briefed are deemed waived.").

[108] *Straine DM Holdings LLC v. Breault*, 2025 WL 275408, at *6 (Del. Super. Jan. 22, 2025) (quoting *Snow Phipps Gp., LLC v. KCAKE Acq., Inc.*, 2021 WL 1714202, at *52 (Del. Ch. Apr. 30, 2021)).

[109] *Id.* (quoting *BitGo Hldgs., Inc. v. Galaxy Digit. Hldgs., Ltd.*, 319 A.3d 310, 333 (Del. 2024)).

forfeiture in Section 2.2.b. Express Scripts argues that the non-waiver provision in Section 7.9 of the Provider Agreement precludes any claim for estoppel.[110]

The Provider Agreement's non-waiver provision states: "[n]o waiver of a breach of any covenant or condition shall be construed to be a waiver of any subsequent breach. No act, delay or omission done, suffered, or permitted by the parties shall be deemed to exhaust or impair any right, remedy or power of the parties hereunder."[111]

Estoppel may apply "'when, by its conduct, a party intentionally or unintentionally leads another, in reliance on that conduct, to change position to his detriment.'"[112] Estoppel is typically a question reserved to be determined by the trier of fact.[113]

"'[T]he law is clear that non-waiver clauses are not iron-clad protections that preclude courts from holding [a party] responsible for their post-contracting behavior,'" and such provisions "do[] not 'have the unfettered power in all circumstances to supersede the doctrines of waiver and estoppel.'"[114] Accordingly,

---

[110] RB at 14; Provider Agreement § 7.9; Tr. at 19.
[111] Provider Agreement § 7.9.
[112] *Jiggy Puzzles, LLC*, 2026 WL 465112, at *19 (quoting *In re Coinmint, LLC*, 261 A.3d 867, 894 (Del. Ch. 2021)).
[113] *Id.* (citing *Dervaes v. H.W. Booker Constr. Co.*, 1980 WL 333053, at *10 (Del. Super. May 28, 1980)).
[114] *In re Coinmint, LLC*, 261 A.3d at 899 (quoting *Viking Pump, Inc. v. Liberty Mut. Ins. Co.*, 2007 WL 1207107, at *28 (Del. Ch. Apr. 2, 2007)).

a non-waiver provision does not preclude the defenses of waiver or estoppel at this stage.[115]

The Provider Agreement's non-waiver provision does not preclude Albertsons from raising the defense of estoppel, which raises questions of fact that cannot be resolved on a motion to dismiss.[116]

## VI.    CONCLUSION

The Provider Agreement permits Express Scripts to exercise its discretion to select one of the four identified data sources to classify a drug as Generic or brand at the time of reconciliation.  The purpose of the reconciliation process is to ensure that Albertsons receives the guaranteed payment set forth in the Rate Schedule tables.  Because the Provider Agreement permits the conduct Albertsons challenges, its implied covenant of good faith and fair dealing claim must be dismissed.  The Motion is **GRANTED** on Count II.

Similarly, the Provider Agreement governs the parties' conduct and therefore, the unjust enrichment claim must be dismissed.  The Motion is **GRANTED** on Count III.

---

[115] *Id.* at 900.
[116] *Jiggy Puzzles, LLC*, 2026 WL 465112, at *19.

Albertsons has raised defenses to the enforcement of the dispute resolution process, which cannot be resolved at this stage of the proceeding.  Accordingly, the breach of contract claim is not dismissed.  The Motion is **DENIED** on Count I.

**IT IS SO ORDERED.**

_/s/Kathleen M. Miller_
Kathleen M. Miller, Judge
